IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JAMES L. SHERLEY**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs**, | ) | |
| | ) | |
| v. | ) | Case No. 1:09-cv-01575-RCL |
| | ) | |
| **KATHLEEN SEBELIUS**, in her official | ) | |
| capacity as Secretary of the Department of | ) | |
| Health and Human Services, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL AND FOR EXPEDITED BRIEFING AND CONSIDERATION</u>

Defendants ask this Court to stay, pending appeal, its preliminary injunction in this case in order to avoid terminating research projects midstream, invalidating results in process, and impeding or negating years of scientific progress toward finding new treatments for devastating illnesses such as diabetes, Parkinson's disease, and blindness, as well as crippling spinal cord injuries, through research involving human embryonic stem cells ("hESC"). Defendants have appealed (Dkt. No. 46) the Court's August 23, 2010 Order (Dkt. Nos. 44, 45), granting plaintiffs' Motion for Preliminary Injunction. The Court's Order is sweeping, enjoining "defendants and their officers, employees, and agents . . . from implementing, applying, or taking any action whatsoever pursuant to the National Institutes of Health Guidelines for Human Stem Cell Research ("Guidelines"), 74 Fed. Reg. 32,170 (July 7, 2009), or otherwise funding research involving human embryonic stem cells as contemplated in the Guidelines." (Dkt. No. 45). The Guidelines cover research that has been ongoing for years, including under the policies of the prior Administration.

Read literally, therefore, and in the absence of any further *sua sponte* clarification by this Court of its Order, the prohibition on funding "research involving human embryonic stem cells as contemplated in the Guidelines" effectively bars funding for *any* hESC research.  The Order upsets the *status quo* in other ways too, causing irrevocable harm to the millions of extremely sick or injured people who stand to benefit from continuing hESC research, as well as to the defendants, the scientific community, and the taxpayers who have already spent hundreds of millions of dollars on such research through public funding of projects which will now be forced to shut down and, in many cases, scrapped altogether.

As discussed below, defendants' appeal will raise substantial arguments in support of NIH's authority, consistent with the Dickey-Wicker Amendment, to continue funding research involving hESC as they have over the past year in accordance with Executive Order 13505, as well as hESC research under the previous Administration's policies.  As this Court noted in its Memorandum Opinion, such research was permitted in accordance with NIH's long-standing interpretation of the language of the Dickey-Wicker Amendment, language that defendants have "maintained . . . since 1999" without any action by Congress "in response" to that interpretation. Mem. Op. at 5.  Indeed, Congress has done more than acquiesce in NIH's interpretation:  it has expressly endorsed the view that hESC research is not barred by the Dickey-Wicker Amendment.  In light of the endorsement by Congress of that rational, long-standing interpretation – an endorsement that was magnified by Congress's approval of the interpretation in the recent passage of the 2010 appropriations for NIH – defendants respectfully assert that their interpretation is consistent with the language of the statute and congressional intent.  At a

minimum, this active endorsement demonstrates that the Court's view that the Dickey-Wicker Amendment unambiguously prohibits hESC research is subject to serious debate.

The issuance of a stay is necessary to prevent the irreparable harm that is certain to occur if, during the pendency of its appeal, NIH is forced to cease all activities pertaining to hESC research that is subject to government funding.  The Order, in requiring NIH to stop funding hESC research, not only prevents new hESC research from getting under way, but also will have a devastating impact on the viability of research currently in progress.  Numerous ongoing projects will likely not survive even a temporary gap in funds, jeopardizing both the potential benefit of the research and the hundreds of millions of dollars of taxpayer funds already invested in it.  This devastating impact on hESC research is an injury to NIH's mission, the larger biomedical community, the public at large, and, most critically, the millions of people who are hoping to benefit from life-saving therapies made possible by hESC research.  There is great potential for significant breakthroughs, but not if research is halted for the time between the present and when the appeal is decided.

When these injuries are weighed against the injuries purportedly suffered by plaintiffs, the balance of hardships tips decidedly in favor of a stay.  While plaintiffs were free, even under the Guidelines, to continue submitting applications for adult stem cell research funding and to compete for funding on a merit basis, the Court's injunction now makes it impossible for hESC researchers to do the same.  It is highly doubtful that plaintiffs' economic or professional interests will be affected in any way if the preliminary injunction is stayed – applications for research involving adult stem cells, iPSC, and hESC are not in direct competition with each other.  NIH estimates that it will award significantly more for non-embryonic stem cell research

this year.  Indeed, NIH has awarded more for non-embryonic stem cell research than it has

provided for all hESC research to date, and ongoing hESC research and applications for funding

have posed no barrier for either plaintiff, one of whom has apparently never even applied for any

NIH research grants.  More importantly, plaintiffs' remote economic self-interests do not

outweigh the harm the injunction will cause NIH, the hundreds of affected hESC researchers,

and the millions of individuals who hold out hope that hESC research will lead to the cure for, or

treatment of, their currently incurable illnesses.  Defendants respectfully assert that the balance

of harms, coupled with the substantial legal questions presented in defendants' appeal,

necessitate the issuance of a stay pending appeal.

 In light of the immediacy and magnitude of the injury to defendants and the public in the

absence of a stay, defendants further request expedited briefing and consideration of their

motion.  As shown more fully below, each day the preliminary injunction remains in place

increases the harm to the critical research that NIH supports, and thus the harms to NIH's

mission and to the public at large.  Among other irreparable harms already accruing as a result of

the Order, hESC intramural research, which is conducted internally by NIH, has started to

disassemble.  This has disastrous consequences for NIH's existing intramural research projects,

and indeed threatens not only ongoing research but the very existence of some stem cell lines.

Also, there are 24 ongoing extramural research projects that are up for renewal of funding

between this date and the end of the September.  Without continued federal funding, the benefits

of all prior work on these projects could be lost.  On the basis of these and other present and

increasing harms detailed below and in the accompanying Declaration of Dr. Francis Collins,

Director of NIH, defendants request that plaintiffs' opposition to their motion for stay be due by

Friday, September 3, 2010, and that the Court rule by September 7, 2010.  If the Court has not

ruled on defendants' motion, they intend to present their stay request to the Court of Appeals the

following day.

## BACKGROUND

In this action, plaintiffs seek to permanently enjoin the Guidelines, which established

policy and procedures for the funding of hESC research – both new and ongoing – and

implemented President Obama's Executive Order removing barriers to funding of categories of

promising hESC research that had been previously ineligible for federal funds.  Plaintiffs moved

to preliminarily enjoin the implementation and application of the Guidelines (Dkt. No. 3), and

defendants opposed that motion and moved, in the alternative, to dismiss plaintiffs' claims for

lack of jurisdiction.  (Dkt. Nos. 22, 23).  On October 27, 2009, the Court granted defendants'

motion to dismiss for lack of standing.  Plaintiffs appealed, and on June 25, 2010, the Court of

Appeals reversed the Court's ruling with respect to the standing of Drs. James Sherley and

Theresa Deisher.  *Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010).  Because the Guidelines

could be expected to increase the number of grant applications for hESC research, the Court of

Appeals reasoned that they would "intensif[y] the competition for a share in a fixed amount of

money."  *Id.* at 74.  Plaintiffs, as scientists who conduct research on adult stem cells and have

received or have stated their intent to seek research grants from NIH, were therefore found by the

Circuit to have made a basic showing of "competitor standing" sufficient to establish

jurisdiction.  *Id.*  The Court of Appeals declined to reach the merits of plaintiffs' claims,

remanding to this Court for further proceedings on plaintiffs' motion for preliminary injunction.

*Id.* at 75.

On the same day that the mandate was entered on the docket of the district court and without further briefing from the parties, the Court granted plaintiffs' motion for preliminary injunction. The Court enjoined defendants and their officers, employees, and agents from "implementing, applying, or taking any action whatsoever pursuant to the National Institutes of Health Guidelines for Human Stem Cell Research, 74 Fed. Reg. 32,170 (July 7, 2009), or otherwise funding research involving human embryonic stem cells as contemplated in the Guidelines." (Dkt. No. 45). By its terms, the Order forecloses NIH from awarding any additional funds for extramural research (i.e., research conducted by researchers outside NIH) involving hESC, including not only new grants but also continuing funding for research projects that are already underway – some for many years – whose funding will soon be up for renewal. Read literally, it also bars ongoing research initiated in compliance with the prior Administration's hESC policy; NIH's own intramural hESC research (which is not funded by grants for which plaintiffs could be eligible); and other activities, including NIH's peer review process for grant applications and continuing maintenance of the Human Embryonic Stem Cell Registry on which much of the biomedical community relies.

Defendants seek a stay of the Order in its entirety, based on the above understanding of the Order's scope, to which defendants are seeking to conform. The ban on funding extramural research, standing alone, will inflict irreparable harm pending appeal, and a stay is essential. And even if the Court's Order was not intended to prohibit intramural research or research commenced under the prior Administration's policies, defendants must attempt to comply with the Order as written, and thereby will suffer additional forms of irreparable harm absent a stay (and absent immediate *sua sponte* clarification from the Court).

With respect to funds already awarded for hESC extramural research and made available to the grantees prior to the Court's Order, defendants do not construe the Order to require them to take affirmative steps to prevent grantees from drawing down previously issued awards, which grantees are entitled to use under their agreement with HHS and on which the grantees are relying to pay for expenses, some of which have already been incurred, and HHS has so advised grantees.[1]  If, contrary to defendants' understanding, the Court were to declare that the Order extends to funds that have already been awarded to grantees, the harm would increase by such an order of magnitude that, in the event the Court does not stay the Order in its entirety, defendants request a stay insofar as, in the Court's view, the Order would prohibit the grantees from withdrawing funds from their pre-existing accounts.

## ARGUMENT

In light of defendants' decision to appeal the Court's August 23, 2010 Order, the weighty issues presented in this case that must be resolved on appeal, and the irreparable injury that defendants and the public would suffer if that Order remains in place pending resolution of their appeal, defendants respectfully seek a stay.  Courts consider four factors in assessing the propriety of granting a motion for stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable damage absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest.  *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (internal citations omitted) .

---

[1] When funds are awarded, they are placed in a federal account in the name of the grantee (typically an academic institution).  All grants awarded to a single grantee are placed into the same account.  Grantees may transfer money from their federal account to their own bank account at their discretion by directing a funds transfer through an HHS online payment system, which automatically authorizes a funds transfer to the grantee's private bank account.  There are guidelines for expenditures and grantees are required to prepare quarterly reports on their progress and expenses, *see* http://grants.nih.gov/grants/managing_awards.htm, but grantees do not need HHS's permission to draw down their accounts.

These familiar equitable factors cannot be reduced to a "set of rigid rules," but rather necessitate "individualized judgments in each case." *Hilton*, 481 U.S. at 777.  For instance, the district court, having already ruled against the movant on the underlying legal questions, need not be convinced that the movant has "an absolute certainty of success" on appeal.  Instead, "[i]t will ordinarily be enough that the [movant] has raised serious legal questions going to the merits, so serious, substantial, difficult as to make them a fair ground of litigation . . ." *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)), a requirement that may be satisfied if the legal question is one of first impression, *Pan Am Flight 73 Liaison Group v. Dave*, No. 10-mc-0077, 2010 U.S. Dist. LEXIS 68245, at *12 (D.D.C. July 9, 2010); *see also Peck v. Upshur Cnty. Bd. of Educ.*, 941 F. Supp. 1478, 1481 (N.D. W. Va. 1996) ("To find that plaintiffs have a strong likelihood of success on appeal, the Court need not harbor serious doubts concerning the correctness of its decision.  Otherwise, relief under rule 62(c) would rarely be granted.  What is fairly contemplated is that tribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained.").  The substantiality of defendants' arguments on appeal, together with the balance of hardships, weigh heavily in favor of granting a stay pending appellate review.

## I.    DEFENDANTS' APPEAL RAISES SERIOUS LEGAL QUESTIONS WARRANTING A STAY

Defendants respectfully assert that there is a substantial likelihood that they will ultimately prevail on appeal.  Even if the Court reaches a different assessment, defendants' appeal plainly raises serious questions concerning the appropriate interpretation of the Dickey-

Wicker Amendment, which the Court construed in a manner contrary to the interpretation long

held by defendants and repeatedly endorsed by Congress.

> **A.      There is a Serious Question Whether This Court's Reading of the Dickey-Wicker Amendment is Correct.**

The Court held that the Dickey-Wicker Amendment's prohibition on the use of federal

funds for "research in which a human embryo or embryos are destroyed, discarded, or knowingly

subjected to risk of injury or death greater than that allowed for research on fetuses in utero

under" applicable federal regulations was "unambiguous."  Mem. Op. at 10.  According to the

Opinion, "the term 'research' as used in the Dickey-Wicker Amendment has only one meaning,

i.e., 'a systematic investigation, including research development, testing and evaluation, designed

to develop or contribute to generalizable knowledge.'"  *Id.*  Following this definition, the Court

rejected NIH's long-standing interpretation of the language in the Dickey-Wicker Amendment as

prohibiting federal funding for the "derivation of stem cells from an embryo that results in the

embryo's destruction," but permitting federal funding for "research involving hESCs that does

not involve an embryo nor result in an embryo's destruction."  *Id.* at 8.  The Court held that such

a conclusion best fulfilled "the unambiguous intent of Congress to enact a broad prohibition of

funding research in which a human embryo is destroyed."  *Id.* at 10.

Defendants respectfully assert that the Court's conclusions about the statutory language

of the Dickey-Wicker Amendment and the intent of Congress in reauthorizing the Amendment

raise serious issues of law to be decided on appeal.  As to the statutory language itself, even if

one were to reject, as the Court did, the alternative dictionary definitions of the term "research,"

which do not read the term as broadly as the plaintiffs have asserted, *see, e.g.*, RANDOM

HOUSE DICT. (2009) (defining "research" as "a particular instance or piece of research"), the

result still does not command rejection of defendants' long-standing interpretation of the statute. The Court accepted plaintiffs' definition of research as a "systematic investigation."  But as defendants noted in their Opposition to the Motion for Preliminary Injunction, the word "systematic" is not commensurate with the term "unending" or "undivided"; it refers instead to "having, showing, or involving a system, method, or plan."  RANDOM HOUSE DICT. (2009).  A particular research project involving stem cells can therefore be "systematic" or "methodical" without needing to include within its scope all steps by other, completely independent parties, that made the research possible.  *See* 42 C.F.R. § 52.2 (defining the term "research" in the context of research grants to mean "a systematic investigation, *study* or *experiment* designed to contribute to general knowledge relating broadly to public health") (emphases added).

In any event, this debate is mainly a theoretical one, as it divorces the term "research" from its context in the statute.  As defendants described in their Opposition to plaintiffs' Motion for Preliminary Injunction, the term "research" in the Dickey-Wicker Amendment does not stand alone; it is followed and informed by the phrase "in which . . . embryos are destroyed."  Thus, the research for which federal funding is prohibited is, as a threshold matter, only that "in which" embryos "are" used.  The term "in which" typically has a limiting connotation when used as a prepositional phrase, *see* RANDOM HOUSE DICT. (2009) (defining "in," as a preposition, to be "used to indicate limitation or qualification, as of situation, condition, relation, manner, action, etc."), and the phrase's use of the present tense demonstrates that it was not intended to encompass any and all past or future uses or destructions of embryos, *see Sutton v. United Air Lines*, 527 U.S. 471, 482 (1999).  Thus, in defendants' view, the particular "research" that is prohibited must be that "in which" an embryo "is" actually involved.  A scientist who obtains

-10-

hESC from a third party for use in a research project has not thereby engaged in the "research" the third party previously undertook to derive the hESC, any more than a researcher whose work builds on a prior scientific breakthrough could be credited with making the breakthrough itself.[2] Although the Court rejected that view and found the statutory language in the Dickey-Wicker Amendment unambiguous, there is room for serious debate on this point.

The Court interpreted the language to clearly prohibit all federal funding for research projects involving hESC (because the hESC used in that research are produced by self-renewing cell lines established from cells extracted at one time, even years earlier, from an embryo that was destroyed in the process), but there is serious doubt whether Congress intended such a broad interpretation of the Dickey-Wicker Amendment.  Although the Court concluded that such intent was "unambiguous," the Court nevertheless recognized in its Opinion that NIH first stated its interpretation in 1999 (and has actually funded hESC research since 2002).  Yet Congress has continued to include the Dickey-Wicker Amendment in annual appropriations to NIH without adjusting the language of the Amendment, Mem. Op. at 5, and Congress repeatedly and expressly acquiesced to the use of federal funds for hESC research under former President Bush. *See, e.g.,* H.R. Rep. No. 107-229 at 180 (Oct. 9, 2001) ("The Committee continues a provision to prohibit the use of funds in the Act concerning research involving human embryos.  However, this language should not be construed to limit federal support for research involving human embryonic stem cells and carried out in accordance with policy outlined by the President."); S. Rep. No. 107-84 at 18 (Oct. 11, 2001) ("The Committee urges the NIH to move quickly to

---

[2] Indeed, the scientist who performed the stem cell extraction is likely to be different than the scientist who purchases the cells which he then will use for research for which he seeks or receives NIH funding.  Even if the cell extraction process were considered to be research, NIH funding would not have been used for that extraction process.  Even when the same scientist performs the extraction and conducts the NIH funded research, NIH funds are still not being used in the extraction process.

support all types of stem cell research, including embryonic, adult, and cord blood . . . ."); *see also, e.g.*, H.R. Rep. No. 110-231 (July 13, 2007); H.R. Rep. No. 108-636 (Sept. 7, 2004); H.R. Rep. No. 108-188 (July 8, 2003). In fact, following the issuance of the final Guidelines by NIH and while this case was on appeal to the D.C. Circuit, Congress again included the Dickey-Wicker Amendment in the 2010 appropriations to NIH without substantive change. *See* Pub. L. No. 111-117, Title V, § 509 (2010). In so doing, Congress again reaffirmed that the Amendment's "language should not be construed to limit Federal support for research involving human embryonic stem cells carried out in accordance with policy outlined by the President." H.R. Rep. No. 111-220 at 223 (July 22, 2009); S. Rep. No. 111-66 at 121 (Aug. 4, 2009) ("The Committee is pleased that stem cell research was included as a special emphasis area in the NIH Challenge Grant program . . . . The Committee also welcomes the recent release of guidelines for the use of human embryonic stem cells [hESC] with NIH funds . . . ."); *see also* H.R. Rep. No. 111-366 at 982 (Dec. 8, 2009) ("In implementing this conference agreement, the Departments and agencies should be guided by the language and instructions set forth in House Report 111-220 and Senate Report 111-66 accompanying the bill, H.R. 3293.").

Congress's repeated endorsement of federal funding for research on stem cells derived from human embryos is difficult to square with the conclusion that Congress unambiguously intends in its annual reenactment of the Dickey-Wicker Amendment to prohibit federal funding for any and all hESC research. *See, e.g., FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156 (2000) ("[I]t is hardly conceivable that Congress—and in this setting, any Member of Congress—was not abundantly aware of what was going on."); *FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 437 (1986) ("At no point did Congress criticize the FDIC's longstanding

interpretation . . . .").  In light of this clear history, there is, at a minimum, a serious question whether Congress could have intended the interpretation proffered by plaintiffs and adopted by this Court.

**B.      The Legal Questions on Appeal Are Particularly Serious Given the Apparent Scope of the Court's Injunction.**

On its face, the Court's injunction Order has sweeping, and potentially catastrophic, consequences for one of NIH's core research missions.  The Order forecloses NIH from awarding additional funds for extramural research (i.e., research conducted by researchers outside NIH) involving hESC, including providing any new or supplemental funds, even if the researchers who receive the grant do not themselves destroy, discard, or otherwise deal with embryos in any way.  The Order's prohibition extends to research projects that are already underway – some for many years – whose funding will soon be up for renewal, as well as grants for new projects that were about to be approved for funding.  But the terms of the Order go even further and impose the following additional consequences:

- The terms of the Order appear to reach NIH's intramural research, even though such research does not involve grants that plaintiffs could receive and plaintiffs face no competition from intramural research.  The research is, however, to be conducted in a manner consistent with the Guidelines, as stated in the Guidelines themselves.  74 Fed. Reg. at 32,170.  Thus NIH, in paying for it, arguably is "funding research involving human embryonic stem cells as contemplated in the Guidelines."

- By enjoining defendants from "taking any action whatsoever pursuant to" the Guidelines, the Order requires the cessation of NIH's peer review process for hESC applications, of continuing maintenance of the Human Embryonic Stem Cell Registry on which much of the biomedical community relies, and of NIH's administrative and regulatory activities in connection with the Guidelines.

- Because ongoing research initiated in compliance with the prior Administration's hESC policy is encompassed within the current Guidelines and because research approved under that prior policy, like any research involving hESC, uses stem cells derived from embryos that were, at some point, destroyed or discarded, the Court's Order as phrased prohibits that research as well.

Defendants seek a stay of the Order in its entirety, based on the above understanding of the Order's scope, to which defendants are seeking to conform. Of course, as defendants will show, the Order would inflict serious irreparable harm warranting a stay even if it was intended only to prohibit funding for new, post-Guidelines extramural hESC research. But, by its terms, the Order also bans intramural research, research commenced under the prior Administration's policies, and other NIH functions such as continuing maintenance of the Human Embryonic Stem Cell Registry; accordingly, defendants must attempt to comply with the Order as written, unless and until the Court issues the stay defendants seek (or *sua sponte* clarifies that such effects were not intended).

## II.     DEFENDANTS WILL SUFFER IRREPARABLE INJURY ABSENT A STAY

Implementation of the Court's Order, even during the pendency of defendants' appeal, will deal a serious blow to NIH and to the hESC research that it funds. NIH's mission is to promote the advancement of fundamental knowledge about the nature and behavior of living organisms and the application of that knowledge to the causes, diagnosis, prevention, and cure of human diseases, conditions, and injuries. *See* Declaration of Francis Collins, M.D., Ph.D, Director of the National Institutes of Health ("Dr. Collins Decl.") ¶ 3, attached hereto as Exhibit A. Stem cell research, and specifically hESC research, holds great promise for the development of treatments for a wide range of serious and life-threatening diseases and conditions. *Id.* ¶ 5. To date, therapeutic drugs involving differentiated cells derived from hESC are under development for a number of diseases, including amyotrophic lateral sclerosis ("ALS" or "Lou Gehrig's Disease"), and the FDA recently approved the enrollment of spinal cord injury patients in the first ever clinical trial of a hESC-derived therapy. *Id.* ¶ 6. By enjoining funding for hESC

research "as contemplated by the Guidelines," the Court's Order not only compromises NIH's

ability to support the most promising and meritorious research – a key aspect of the Institutes'

mission – but it also prevents NIH (as well as the larger scientific community and the millions of

people suffering from devastating illness or injury) from realizing the benefits of hESC research

in which the federal government has already invested significant resources.

Implementation of this Order will have particularly harsh effects on the NIH intramural

research program.  In 2009 there were 8 intramural hESC research projects staffed by

approximately 45 scientists and other personnel, with a total combined budget of approximately

$9.5 million.  *Id.* ¶ 17.  By its terms, the Order covers these projects as well as hESC intramural

projects initiated in 2010, even though Plaintiffs do not in any sense compete for these funds.[3]

The scope of these projects is broad, covering research areas such as cancer, neurological

diseases, cardiovascular disease, human development, and eye diseases.  *Id.*  NIH has already

initiated intramural research project termination activities in response to this Court's Order.  *Id.*

The longer that NIH is prevented from carrying out intramural research, the more likely it is that

unique biological materials that have taken years to develop and that require ongoing

maintenance and attention will be lost.  *Id.* ¶ 12.  The intramural program also houses a Human

Stem Cell Unit, which characterizes the properties of hESC lines, trains intramural investigators

to use hESC in experiments, and collaborates with them on specific projects.  *Id.* ¶ 17.  At the

time of the Order, NIH was in the process of recruiting a new Director for an intramural induced

pluripotent stem cell ("iPSC") center within the Center for Regenerative Medicine.  One of the

goals of this iPSC center is to compare iPSC with hESC.  The inability to use hESC for such

---

[3] By its terms, the Order enjoins defendants from funding hESC research "as contemplated in the
Guidelines."  (Dkt. 45).  Although the Guidelines were issued to implement Executive Order No. 13505 as it
pertains to extramural hESC research, on their face they provide that intramural research must also be conducted in a
manner "consistent with" the Guidelines.  74 Fed. Reg. at 32,170.

comparison studies will likely affect this recruitment and the scope and value of the research planned for this regenerative medicine center. *Id.*

The Order also jeopardizes NIH-funded extramural research, including research that is already under way. For instance, the Order prevents NIH from providing additional funding to 24 hESC projects that have already received some funding from NIH but which depend on supplemental funds for their survival. *Id.* ¶ 10. Absent the Court's Order, supplemental funds would have been distributed to these projects by the end of September. *Id.* As a result of a suspension of funds, even for the period of appellate review, it is highly likely that many of these research projects will be terminated before the fruits of their research can be obtained. *Id.* Valuable and unique research assets will be lost, and with them, the potential promise of life-saving therapies and advancement in our understanding of some of the world's most debilitating diseases. *Id.* ¶¶ 6, 12. The premature termination of these 24 research projects will also waste the approximately $64 million in funds that the NIH had already invested in this research. *Id.* ¶ 10.

The Order will disrupt not only research initiated after issuance of the challenged Guidelines, but also research initiated well before the Guidelines were issued. *Id.* ¶ 11. Although the challenged Guidelines were issued in July 2009 in response to President Obama's Executive Order directing NIH to remove existing obstacles to funding hESC research, hESC research was eligible for and received federal funding for 7 years prior to the Guidelines' issuance. To date, NIH has invested hundreds of millions of dollars in total for hESC research; this includes funding for projects initiated as early as 2002. *Id.* ¶¶ 8, 11, 21. In the period between now and final judgment in this litigation, many of these long-standing hESC research

-16-

projects would be eligible for renewals of funding, which they have received consistently before

the Court's preliminary injunction.  *Id.* ¶ 11.  However, by its terms, this Court's Order prohibits

NIH from providing any additional funds to support this research.  *Id.*  Consequently, many

hESC research projects that have been ongoing since the Bush Administration will be forced to

shut down due to lack of funding, undermining almost a decade's worth of research.  *Id.*

Even though defendants do not construe the Order to encompass funds that have already

been awarded to grantees, projects that have already received funds for the year are nevertheless

still threatened by the Order.[4]  *Id.* ¶ 14.  Grants typically have 3-5 year project periods but

receive funding only on an annual basis, consistent with NIH appropriations.  *Id.* ¶ 9.  If the

Order remains in place during the appeal and funds must be withheld from these projects in

future fiscal years, the viability of these projects would be in jeopardy, as discussed above.  *Id.* ¶

14.

In addition to potentially destroying years of research conducted within and outside the

NIH community, the Order also substantially impedes NIH's administrative and regulatory

activities in connection with the Guidelines to a degree not susceptible to easy remediation.  *Id.* ¶

18-21.  *Cf. Ledbetter v. Baldwin*, 479 U.S. 1309, 1310 (Powell, Circuit Justice 1986) (finding

irreparable harm where government "will bear the administrative costs of changing its system to

comply with the District Court's order" and will be forced to make payments that will be

irrecoverable).  For example, NIH has ceased all peer review activities of all future hESC

---

[4] Were the Court to declare that its Order forecloses grantees' access to previously-awarded funds, the results would
be all the more catastrophic, forcing the premature termination of additional projects in midstream and threatening
researchers' ability to meet payrolls, maintain the integrity of biological materials, and even care for laboratory
animals. *Id.* ¶¶ 12, 14.  Indeed, adverse effects would be felt across NIH's entire extramural program, if researchers
are now given reason to believe that they cannot count on funds already awarded to them or incur costs in reliance
on those funds.

research applications and estimates that, if it is forced to defer peer review during the pendency

of appeal, it will take as much as 6 to 8 months for the process to begin again with new

applications for research involving hESCs.  Dr. Collins Decl. ¶ 18.  In addition, the process for

determining eligibility of hESC lines that can be used in research for NIH funding and inclusion

on the NIH Human Embryonic Stem Cell Registry will be halted.  *Id.* ¶ 19

      Even if defendants ultimately prevail on appeal, there would be no way to recover the

losses in taxpayer dollars, unique research resources, and medical advancement engendered by

the suspension of funds in compliance with the Order.  *Id.* ¶¶ 8, 12, 14.  These losses – both

economic and intangible – are irreparable.  Once the suspension of hESC funding forces projects

to shut down, they cannot simply be restarted at the conclusion of a successful appeal.  *Id.* ¶¶ 12,

14.  Experiments require ongoing care and monitoring, without which critical and unique

biological materials may be irretrievably lost.  *Id.* ¶ 12.  A stay of the Court's Order is the only

means to avoid serious and irreparable damage to NIH's mission and to the potentially life-

saving research that it funds.

## III.   THE PUBLIC INTEREST WILL BE SERVED BY A STAY

      While the Order will cause devastating and lasting harm to NIH, that harm is by no

means limited to defendants.  Immediate suspension of the Guidelines and of all funding for

hESC research will have an extraordinarily harmful effect on scientific progress, the biomedical

research community, and, most importantly, the prospects for delivering new therapies to

patients suffering from numerous life-threatening or debilitating disorders.  *Id.* ¶ 8.  Accordingly,

the public interest counsels strongly in favor of granting a stay.

The Court's decision on the preliminary injunction focuses on the alleged harm to plaintiffs from the potential denial of their research applications, but it ignores the fact that such harm is now certain to be suffered by hundreds of hESC researchers who are now barred from additional federal funding and may be unable to complete their work.  As set forth in detail in the Declaration of Dr. Collins, the Order jeopardizes the research of Drs. Church, Fox, Spence, and Parsons and numerous other scientists who are in the midst of ongoing investigations of treatments for such debilitating conditions as liver failure and Parkinson's.  *Id.* ¶ 10.  Unlike the plaintiffs, who even in the absence of an injunction would still have the ability to apply for federal funds on equal terms with all other researchers (including hESC researchers), the hESC scientists affected by the issuance of the injunction are now foreclosed from federal funds entirely, compromising their ability to continue their lives' work.  *Id.* ¶ 10.

The effect of the injunction is not limited to the hESC researchers' self-interest, of course.  It also threatens to delay progress toward finding life-saving treatments that could be developed from such research.  Although the Court indicated in its Opinion that such treatments are merely "speculative," the scientific community has readily recognized the promising research and studies conducted with hESC.  *Id.* ¶¶ 5, 6, 10.  Indeed, due to the limitations with adult stem cells that "fifty years of research have not been able to overcome," *id.* ¶ 7, the need to explore research into hESC cannot be overstated.  Such research, despite its relatively recent inception and the political limitations that have heretofore been placed on it, has already yielded promising results.  *See id.* ¶ 6 (explaining that "differentiated cells derived from hESC are already successfully being used to develop new therapeutic drugs for a number of diseases including amyotrophic lateral sclerosis ("Lou Gehrig's disease") and spinal muscular atrophy, to name just

a few").  The Court's Order stops this research in its tracks, undermining years of promising work before potentially life-saving results could be obtained.  For these reasons, the Order's most devastating effects likely fall on the millions of Americans suffering from illnesses currently under study with hESC, including Parkinson's disease, spinal cord injury, liver disease, diabetes, cardiovascular disease, and Alzheimer's disease, and for those who might in the future have received transplants of cells and tissues created from hESC because donated organs are not available.  *Id.*  ¶ 14.  Even if, as the Court noted, it is not certain that each of the research projects will ultimately cure or ameliorate all these conditions, what is certain is that the Court's Order disrupts progress toward that goal and deprives millions of patients of hope.

Because the public interest squarely favors allowing this important research to continue, a stay is warranted.  *Cf. Winter v. NRDC*, 129 S.Ct. 365, 376-77 (2008) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (citation and quotation omitted).

## IV.  THERE IS NO EVIDENCE THAT PLAINTIFFS WILL BE HARMED BY THE ISSUANCE OF A STAY

In contrast to the serious and irreparable harm that the Court's Order will cause to defendants, hESC researchers, the scientific community, and the public at large, plaintiffs do not stand to be harmed in any concrete way if a stay is granted.  While the Court agreed with plaintiffs that they may be irreparably harmed absent a preliminary injunction, *see* Mem. Op. at 14, defendants respectfully assert that this ostensible harm is both conjectural and insignificant, especially when weighed against the immensity of the harm certain to be caused by the Order.  Although the Court of Appeals held that plaintiff researchers had alleged an injury sufficient to establish Article III standing, nowhere did the Circuit suggest that plaintiffs' alleged injury was

so imminent, irreparable, and severe as to warrant injunctive relief.  The only "actual, here-and-now injury" identified by the Court of Appeals was plaintiffs' supposed need to "invest more time and resources to craft a successful grant application," in response to the increased competition from hESC researchers eligible for funding under the Guidelines.  *Sherley*, 610 F.3d at 74.  This ostensible injury is most decidedly not of the sort that would warrant a preliminary injunction or justify the denial of a stay.  *See Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) (inconveniences do not amount to irreparable harm).

Plaintiffs' allegation that they will be denied funds as a result of the Guidelines is conjectural, at best.  There was no evidence before the Court that either remaining plaintiff stood to suffer the denial of a research application as a result of the award of funds to a hESC researcher, let alone suffer such a loss during the pendency of an appeal.  Indeed, the evidence before the Court was that the Guidelines have posed no barrier to either remaining plaintiff.  Dr. Sherley received NIH funding following the issuance of the Guidelines and thus notwithstanding the alleged increase in competition.[5]  Dr. Collins Decl. ¶ 23.  Because applications for research using adult stem cells, iPSC, and hESC are not in direct competition with each other for funds, there is no reason to believe that Dr. Sherley would be affected by the funding of hESCs for the duration of appellate review.  *Id.* ¶ 22.  The likelihood of harm to Dr. Deisher as a result of the stay approaches the vanishing point.  As far as NIH is aware, Dr. Deisher has never made a single application for the funding for which she claims increased competition.  *Id.* ¶ 24.  That plaintiffs never sought an injunction pending their appeal of the Court's prior dismissal of their

---

[5] Although Dr. Sherley has also submitted five grant applications that were not awarded (in addition to those grant applications that were awarded), this denial of funds was in no way attributable to the Guidelines or competition from hESC researchers.  Rather, it was the result of the failure of his projects to clear peer review on the basis of scientific merit, a prerequisite to eligibility for funding.  Dr. Collins Decl. ¶ 23.

claims belies any suggestion they may make that they will face serious harm during the

pendency of defendants' appeal.

     Notwithstanding this Court's finding with respect to the potential harm to plaintiffs'

careers, *see* Mem. Op. at 14, if any researchers' livelihoods are at stake in the Court's decision of

whether to grant a stay, it is the livelihoods of hESC researchers, who are certainly and suddenly

deprived of financial support as a result of the Court's order, not the livelihoods of plaintiffs,

whose research would remain eligible for funds for the duration of defendants' appeal.  A stay

should not be denied for the benefit of two scientists whose only alleged harm is increased

competition from other meritorious research projects that may ultimately save lives.

CONCLUSION

     For all the foregoing reasons, defendants respectfully request that the Court stay its

preliminary injunction pending appeal.  In light of the immediacy and magnitude of the injury to

defendants and the public in the absence of a stay, defendants further request expedited briefing

and consideration of their motion.

Dated: August 31, 2010            Respectfully submitted,

                                   TONY WEST
                                   Assistant Attorney General

                                   RONALD C. MACHEN JR.
                                   United States Attorney

                                   SHEILA LIEBER
                                   Deputy Branch Director, Federal Programs Branch

                                   */s/ Kyle R. Freeny*
                                   ERIC R. WOMACK, IL Bar No. 6279517
                                   JOEL McELVAIN, DC Bar No. 448431
                                   TAMRA T. MOORE, DC Bar No. 488392
                                   KYLE R. FREENY, CA Bar No. 247857
                                   Trial Attorneys, Federal Programs Branch

-22-

U.S. Department of Justice, Civil Division
P.O. Box 883, Washington, DC  20044
Telephone:  (202) 514-5108
Facsimile:  (202) 616-8470
Email:  Kyle.Freeny@usdoj.gov

*Counsel for Defendants*